STATE of Minnesota, Respondent,

v.

Stanford Lee PARKER, Appellant.

No. C 9-83-1114.

Supreme Court of Minnesota.

Aug. 3, 1984.

C. Paul Jones, State Public Defender, Kathy King, Asst. Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas L. Johnson, Hennepin County Atty., Vernon E. Bergstrom, Rick Osborne, J. Michael Richardson, Beverly J. Wolfe, Asst. County Attys., Minneapolis, for respondent.

AMDAHL, Chief Justice.

Stanford Lee Parker was convicted of first-degree murder in the shooting death and robbery of Albert James. *See* Minn. Stat. §§ 609.185(3), 609.05(1), 609.11(5) (1982). A Hennepin County jury found Parker guilty of first-degree felony murder on March 4, 1983, and he was sentenced to the mandatory life term.

Parker challenges the sufficiency of the evidence and also asserts that he was denied his fundamental right to a fair trial because of allegedly improper remarks made by the prosecutor in his closing argument. Since sufficiency of the evidence is an issue, the evidence admitted at trial will be discussed prior to addressing the legal issues.

Albert James left his home at 9 p.m. on February 14, 1982, with approximately $1,000 in cash to go to the Riverview Supper Club. At about midnight, James ran into his girlfriend, Vinisha Gaines, and her mother and a friend of Vinisha's and offered them a ride home. On the way home, the group decided to stop for breakfast at a Perkins Restaurant. Vinisha estimates that they arrived at Perkins at about 1:30 to 2 in the morning. James then drove the women to their home at 1425 Plymouth Avenue.

James pulled into the alley behind the townhouse at 1:50 a.m., and Vinisha's mother and friend left his 1981 blue Lincoln Continental. The Gaines townhouse is on the corner of Irving and Plymouth. Vinisha remained in the car with James, and several minutes later two men approached the car. Vinisha claims that the men approached the car from the direction of Irving Avenue. Although there was a street light nearby at the end of the alley, Vinisha did not recognize either of the two men who approached the car. According to Vinisha, one was approximately 6 feet and the other about 5 feet 4 inches tall. Both men were black, but the shorter man had a lighter complexion than the tall man. Both men were wearing dark leather jackets, dark pants, and hats.

The taller man asked James for some sets (a type of illegal drug consisting of Talwin and "blues" that is dissolved in water and then injected). The taller man then stuck a black handgun in through the open window on the driver's side and fired a shot. Neither James nor Vinisha was hit. Both of the armed assailants then pulled James out of the car, rifled through his pockets, and took his wallet. The men also demanded Vinisha's wallet, removed $18, and threw the wallet back, scattering its contents in the car's interior. Vinisha did not see any drugs taken from James. James was shoved back into the car by the men who started running up Irving Avenue.

Vinisha asked James why he rolled down the window. James' response was that he had no choice, whereupon he set off in pursuit of the robbers. The men were running toward 1215 Irving, a well-known tippling house. According to Vinisha, James did not seem to have any difficulty running.

Vinisha removed the car keys from the ignition and honked the horn of the car. She then heard another gunshot, jumped out of the car, and dived in front of it. Vinisha's mother shouted at her, urging her to run into the house, and shortly thereafter the women learned that James had been shot in front of the tippling house.

Three neighborhood children witnessed the events following the second gunshot. Maurice Whitfield was 14 years old and lived at 1124 Irving with his mother and his aunt's family. At 2 a.m. on February 15, 1982, Maurice and his cousins, 12-year-old Rimon and 10-year-old Regina Lester, were playing and they heard two gunshots. Maurice looked out the window and saw a man staggering, holding his side and yelling, "Get that car." Maurice described the car as a green or gray Lincoln Continental with a pink pillow, shaped like a foot, in the back window of the car. Maurice later

identified George Moore's car as the vehicle that he saw driving away.

Regina Lester corroborated her cousin Maurice's description of the car leaving the scene of the shooting. Regina also saw a pink pillow in the rear window of the car. In contrast to Regina and Maurice, Rimon Lester described the car as short and light blue or silver, and Rimon claims that he did not see anything in the rear window of the car.

Another eyewitness to the shooting was Edward McConaughead, who notified the Hennepin County Attorney's office in August of 1982 that he had information regarding the homicide of Albert James. McConaughead claimed he witnessed the robbery that took place in the alley behind the Gaines townhouse. At the time he notified the authorities, McConaughead was in jail pending a charge of aggravated robbery. The county attorney's office told McConaughead that, if he pled guilty to theft from a person and testified at the grand jury and trial, the 6 months he served would be his total jail time. McConaughead was subsequently released.

McConaughead testified that he was walking to his home at 1314 Irving from a party at approximately 2 a.m. on February 15, 1982, and when he saw a parked vehicle (the victim's), he hid behind a fence along the alley and observed. The witness claimed that he had smoked a marijuana cigarette that evening, but that at 2 a.m. he was in control of his faculties.

McConaughead testified that two men approached a car parked in the alley behind 1425 Plymouth Avenue. McConaughead could not accurately estimate how far away he was, but claims one of the assailants said, "Give me the money and the dope," when they were about 15 feet from the car. According to McConaughead, Stanford Parker was the man who made the request and was brandishing a gun. McConaughead stated he also recognized George Moore and Vinisha Gaines. McConaughead asserted after Parker fired the first shot he decided he should not hang around and left for home. He also stated that he observed

George Moore's Lincoln Continental parked nearby. McConaughead was 100% sure that he saw Parker and Moore.

On cross-examination, McConaughead stated that Vinisha jumped out of James' car immediately after the first shot was fired. He never saw James get out of the car. McConaughead later stated that he walked by the alley at about 1 a.m. as opposed to 2 a.m. He also stated that the car window was rolled up and that the taller of the two men stood further back from the car. McConaughead was not sure how the robbers were dressed, but recalls that they both wore hats. Later, he stated that one of the men was wearing a short jacket. In his grand jury testimony, he claimed the jacket was black leather and the hats were stocking caps. Finally, McConaughead testified that he did not hear a car horn at any time.

On the evening of February 14, 1982, Robert Bledsoe and Charlotte Brown were at the Riverview Supper Club together. Bledsoe and Brown saw James shortly before closing time (midnight on Sunday), and the men made plans to see each other later in the evening. James and Bledsoe had been acquaintances for 25 years. Bledsoe and Brown first drove to Golden Valley and then stopped off at the Irving Avenue tippling house at about 1:20 a.m.

Brown claims that when they arrived at the tippling house she saw a medium sized, dark colored car parked on the west side of Irving near the alley. She also saw someone loitering near the entrance to the alley.

Bledsoe and Brown were inside the tippling house for 30 to 40 minutes before they heard that someone had been shot. Brown heard two shots, but Bledsoe testified that he did not hear any gunfire. Brown and Bledsoe went outside and found James lying on the ground. Bledsoe left the scene to get a pillow, while Brown ministered to James. James did not tell Brown who shot him. According to Brown, a man rummaged through James' pockets while she was taking care of him.

Dr. Amatuzio, the coroner who performed the post mortem examination on James, testified that James died from massive internal hemorrhaging. A single wound was found on the left part of James' abdomen, slightly below the umbilicus. Amatuzio testified that the grease ring around the bullet hole in James' clothing and the absence of powder burns on the clothes indicated that the gun firing the fatal shot was, at a minimum, 2 to 3 feet away. In addition, Amatuzio intimated that the bullet entered at a slight angle and suggested that the wound was inflicted while the decedent was running in a slightly crouched position. On cross-examination, Amatuzio admitted that the wound could have been inflicted when James was in a sitting position.

Meyers was the first policeman to arrive at 1214 Irving, and after summoning an ambulance, Meyers administered first aid to the victim. No weapons were found on the victim. Several minutes later the ambulance arrived at the scene.

Officers Jensen and Prill were also called to 1214 Irving. They were directed to look for a light blue or gray vehicle seen leaving the scene. Prill and Jensen located a light blue or gray 1976 Lincoln Continental, license plate Minnesota EJM 870, parked in the traffic lane on 11th Avenue off Irving. The car was unoccupied. The tire tracks leading to the car indicated that the car had pulled off Irving onto 11th Avenue. The policemen approached the car and shone a flashlight into the interior of the car. Jammed between the two front seats was a gun with its barrel pointing down and handle sticking out. Jensen noticed a set of footprints leading from each side of the automobile and followed the tracks. The trail led Jensen to Irving Avenue and then north. Officer Prill remained with the vehicle while Jensen followed the footprints in the snow. A short time later, two people approached the car.

At about the same time, Officers Arnold and Kurtz arrived. The two people were placed in Arnold's squad car where they were identified as George Moore and appellant Stanford Parker. A third individual, identified as Calvin Daniels, arrived shortly after Moore and Parker. Daniels was about 5 feet 10 inches, 160 pounds, and wearing a blue three-piece suit with a gray brimmed hat.

Officer Arnold described Moore as a black male, 5 feet 10 inches, 180 pounds, wearing a three-quarter length brown leather jacket. Moore had a mustache and was wearing a green jumpsuit underneath his coat and had on a tan cowboy hat. Officer Kurtz described Parker as 5 feet 9 inches, 140 pounds, with a mustache and a goatee, wearing a knee-length beige fur coat and black pinstripe slacks. All three men disclaimed any knowledge of the shooting. The Lincoln was towed to the police garage and was later identified by the neighborhood children, Maurice Whitfield and Regina Lester. The car was registered in Moore's name.

Sergeant Laurence Will was also present when Parker was first approached at 11th and Irving. Will testified that Parker answered questions evasively.

The gun found in Moore's car was a .38-caliber pistol that contained a full load of live ammunition. A dark coat was in the back seat of the car and a pink foot-shaped pillow was in the rear window.

Drake Powers, the state's ballistic expert, testified that the slug found in James' body was fired from either a .38-special or .357-magnum. Although a .38-special was discovered in Moore's car, Powers testified the fatal slug and the slug removed from James' car exhibited significant differences from the bullets fired from Moore's .38. Moreover, Powers asserted that the differences were so marked that Moore's gun definitely was not the murder weapon.

On February 19, 1982, at 2:45 p.m., Lieutenant Pat Hartigan arrested Parker on probable cause for murder. Hartigan advised Parker of his *Miranda* rights, and Parker informed Hartigan that he was willing to talk.

Parker gave the following version of his activities during the evening of February 14 and the early morning of February 15. Early in the evening, Parker visited Kelly Grenough at Mt. Sinai Hospital. Kelly verified the visit. Parker called Moore from the hospital asking for a ride. After picking Parker up, Moore proceeded to a bar where they met Daniels. According to Parker, the three then stopped off at Joe Morgan's house. After leaving Morgan's, they drove downtown to Moby Dick's and stayed until closing.

When the bar closed, the three men drove to Kelly Grenough's apartment on Banneker Street where they had something to eat. Parker claims that they then drove to the tippling house on Irving and arrived shortly after the shooting. Several witnesses testified that they saw Parker, Moore, Daniels, and Joe Morgan in front of the tippling house shortly after the shooting, but presumably before they were accosted by the police. Other than Parker's initial trip to Mt. Sinai Hospital early in the evening, Parker's account of his activities the evening of February 14, 1982, is uncorroborated.

The State also introduced evidence, through the testimony of Carlus Wilder, indicating that the robbery had been planned. Wilder has been convicted of eight felonies, ranging from theft by check to possession of narcotics in a federal institution, and has been in prison four times. Wilder knows Parker and identified him in court. Wilder was incarcerated at Oak Park Heights when, in September of 1982, he informed Hennepin County authorities that he had information concerning the death of James. Lt. Hartigan interviewed Wilder. At the time no representations were made concerning the balance of Wilder's prison term.

Subsequent to Wilder's initial contacts with Hartigan, the Hennepin County Attorney's office offered to release Wilder from prison 11 months early if he would testify before the grand jury and at Parker's trial. Carlus Wilder stated on cross-examination that he would tell the county attorney anything to get out of jail.

Wilder had been acquainted with Parker since May of 1981. Wilder claimed Parker visited him on two occasions prior to James' death. On both occasions, Wilder was under the influence of "T's and blues." On February 10, 1984, according to Wilder, Parker stopped at Wilder's home proposing that Wilder participate in a robbery. In addition, Wilder was asked to procure three guns for the robbery.

Wilder was to be the driver and the fruits of the crime were to be cash and drugs. The first name of the victim was Albert. During the first visit, Wilder had not decided whether to participate in the crime and asked Parker to come back the next day.

When Parker visited Wilder the second day, Wilder declined to involve himself in the robbery, stating that it was not his "bag." Wilder has never been convicted of a violent crime. Parker allegedly then told Wilder that "if Albert bucked he [Parker] might have to shoot him." During this second visit, the victim's full name, Albert James, was revealed. Wilder stated that he previously had purchased drugs from James.

Parker left Wilder's home after Wilder refused to take part in the scheme. Wilder told Parker he would still try to locate three guns, but apparently never did. Wilder saw Parker again on February 19, 1982; both were in jail and Parker stated he was charged with murder. This was Wilder's last contact with Parker.

Finally, three witnesses for the state testified that they saw Parker and his companions late in the evening of February 14, 1982, or early in the morning of February 15, 1982. The critical aspects of these witnesses' testimony is that Parker discussed the robbery with them and asked for their alibi. Between the three witnesses, there are 17 prior convictions, ranging from shoplifting to burglary. During the evening in question, all three of the witnesses had consumed drugs. All three witnesses were together when they claim to have

seen Parker. Joe Morgan testified that he saw Parker at Morgan's home some time around 10:30 to 11 p.m., but in any event he was sure he saw Parker before 12:30 to 1 a.m. Terry Henderson testified that he arrived at the Morgan house sometime before 10 p.m. that evening. Kathy Morgan stated that she saw Parker anywhere from one-half hour to an hour after Henderson arrived.

When Joe Morgan arrived home, Henderson, Kathy Morgan, Daniels, Moore, and Parker were present. Morgan testified that he saw two large cellophane bags full of drugs on the table. Morgan did not know the source of the drugs, but claimed Parker mentioned the robbery of an unnamed man known to Morgan. In addition, Morgan claimed Parker told Daniels he was stupid because Daniels "didn't have to waste him." No one, however, expressly mentioned a shooting. Morgan recognized a long, beige fur coat as the coat Parker was wearing. Finally, Morgan alleged that the three men (Daniels, Moore, and Parker) asked Morgan to alibi for them. Kathy Morgan's version is similar to her husband's except that she testified that Parker claimed to have had to "dust" someone.

Terry Henderson is Joe Morgan's criminal partner and admits to supporting himself by shoplifting. The Hennepin County Attorney told Henderson that he would only have to serve 1 year if he testified against Moore, Daniels, and Parker. Henderson also claims that Parker mentioned a robbery that did not go as planned, and that someone was shot. None of the men were carrying guns, according to Henderson. Henderson also testified that Parker asked Henderson to alibi for him.

■ 1. In Minnesota, an appellate court reviewing a claim of insufficiency of evidence, is required to interpret the evidence in the light most favorable to the verdict and must assume that the jury disbelieved any testimony conflicting with the result reached. *State v. Oevering*, 268 N.W.2d 68, 71 (Minn.1978); *see also State v. Dodis*, 314 N.W.2d 233, 237 (Minn.1982); *State v. McCullum*, 289 N.W.2d 89, 91

(Minn.1979). Deference is given to jury verdicts and if the jury, giving due regard to the presumption of innocence and the state's burden of proving guilt beyond a reasonable doubt, could reasonably have found defendant guilty, the verdict will not be upset. *See State v. Turnipseed*, 297 N.W.2d 308, 313 (Minn.1980); *McCullum*, 289 N.W.2d at 91; *State v. Norgaard*, 272 Minn. 48, 52, 136 N.W.2d 628, 632 (1965).

■ In the instant case there was unquestionably sufficient evidence to sustain Parker's conviction. The testimony of Carlus Wilder, if accepted by the jury, proves the planned nature of the crime and the victim. A significant amount of testimony places George Moore's car at the scene of the crime. Finally, Parker was seen by McConaughead participating in the attempted robbery and he later bragged about the shooting to Henderson and the Morgans. Our standard of review of a jury verdict compels us to affirm Parker's conviction. Viewing the evidence most favorable to the state and assuming the jury believed the state's witnesses and disbelieved any contradictory evidence mandates affirmance. *State v. Thompson*, 273 Minn. 1, 36, 139 N.W.2d 490, 515, *cert. denied*, 385 U.S. 817, 87 S.Ct. 39, 17 L.Ed.2d 56 (1966). *See State v. Dodis*, 314 N.W.2d 233, 236 (Minn.1982); *State v. Collins*, 276 Minn. 459, 470, 150 N.W.2d 850, 858 (1967), *cert. denied*, 390 U.S. 960, 88 S.Ct. 1058, 19 L.Ed.2d 1156 (1968).

■ 2. Parker's claim that he was denied his fundamental right to a fair trial is premised primarily on allegedly improper remarks made by the prosecutor in his closing argument. The propriety of a prosecutor's final argument is a matter within the sound discretion of the trial court. *State v. Fossen*, 282 N.W.2d 496, 503 (Minn.1979). Generally, a defendant is deemed to have waived his right to raise an issue concerning the prosecutor's closing remarks if the defendant fails to object or seek cautionary instructions. *State v. Gunn*, 299 N.W.2d 137, 138 (Minn.1980); *State v. Flom*, 285 N.W.2d 476, 477–78 (Minn.1979). Notwithstanding this general

principle, this court can reverse a conviction even when defendant failed to preserve the issue on appeal, if the prosecution's comments are unduly prejudicial. *Gunn,* 299 N.W.2d at 138.

In the instant case Parker failed to object and failed to request curative instructions. Parker's failure to object to the prosecutor's statements implies that the comments were not prejudicial. *See State v. Thomas,* 305 Minn. 513, 517, 232 N.W.2d 766, 769 (1975).

 At several points in his closing argument, the prosecutor discussed the veracity of the state's witnesses. (*E.g.:* "But there is an even more persuasive reason, I think, they are telling the truth. * * * That is why I say to you that if you think that these witnesses are lying, you can only come to that conclusion if you come to the conclusion that this whole thing is a phony and stinks from top to bottom and stem to stern. * * * But I do tell you these witnesses couldn't have done it by themselves, make up a big lie and tell it.") Although we disapprove of closing arguments personally endorsing the credibility of the state's witnesses and injecting personal opinion, we do not believe that the statements made in the instant case reach the threshold of impropriety. The prosecutor's closing argument was not prejudicial and therefore we affirm Parker's conviction for first-degree felony murder.

Affirmed.