**STATE of Minnesota, Respondent,**

v.

**Doris Louise HOLDEN, Appellant.**

**No. C6–87–1029.**

Court of Appeals of Minnesota.

Oct. 27, 1987.

Review Denied Jan. 15, 1988.

Hubert H. Humphrey, III, Atty. Gen., Robert A. Stanich, Sp. Asst. Atty. Gen., St. Paul, Stephen C. Rathke, Crow Wing Co. Atty., Brainerd, for respondent.

C. Paul Jones, Public Defender, Cathryn Y. Middlebrook, Asst. Public Defender, Minneapolis, for appellant.

Considered and decided by NORTON, P.J., and MULALLY and LOMMEN, JJ.,* with oral argument waived.

## OPINION

**A. PAUL LOMMEN, Judge.**

This is an appeal from judgments of conviction of one count of first degree criminal sexual conduct, Minn.Stat. §§ 609.342(a) and 609.05 (1982), and one count of third degree criminal sexual conduct, Minn.Stat. §§ 609.344(b) and 609.05 (1982). The court sentenced Holden to 43 months in prison for the first degree criminal sexual conduct conviction, and a consecutive term of 18 months, stayed, for the third degree criminal sexual conduct conviction. We affirm.

## FACTS

Appellant Doris Holden was questioned by Brainerd police on May 12, 1986 concerning allegations of sexual abuse in her home made that afternoon by her niece, C.H. Holden's husband, William Holden, had been arrested the previous week following allegations of sexual abuse made by the Holdens' daughter. C.H. told police sexual acts had occurred in the Holdens' home between herself and William Holden, in which Doris Holden was an observer, and to some extent a participant.

Brainerd Police Officer Larry Helsene testified at the omnibus hearing that Doris Holden was approached by police officers at the home of her in-laws, with whom she was staying. Helsene himself did not go to the residence. At trial, Helsene testified he had contacted Holden, and that she had come to the station in a squad car only because she did not have alternative transportation.

The interview with Holden occurred in the investigator's office, a room just off the lobby of the law enforcement center. The interview began at 5 p.m., when the receptionist, who was not in police uniform, would have just been leaving. A social worker, Nancy Archibald, sat in during Helsene's interview with Holden. Helsene did most of the questioning. No Miranda warning was given to Holden, and she was not told she could leave the room.

Both Helsene and Archibald testified Holden lost her composure and cried several times during the interview. From the start, questioning focused on the allegations made by C.H. of sexual activity in the Holden home involving C.H. and her brother, T.H. Helsene left the room on two occasions, once to put Holden at ease by leaving her with another woman and then to confer with his supervisor.

During the interview, Holden admitted fondling T.H. to the point of erection, and having him climb on top of her. She did

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

not admit penetration occurred, and testified it was a one-time occurrence. Helsene testified Holden admitted watching and "participating in" the sexual activity between her niece, C.H., and her husband.

The interview lasted over an hour. When the decision was made to arrest Holden, Helsene asked her if she would give a taped statement. Holden was confused, asked Helsene and Archibald for advice, which they explained they could not give, and stated she would normally ask her husband what to do in such a situation. Holden was then given a Miranda warning. She did not give a statement for tape recording, and was then taken into custody.

The day after the arrest, Helsene called the jail and left a message for Holden inquiring whether she would like to talk to him. She responded she would talk with him, and he reminded her of the Miranda warning given the previous day, but did not reread the warning. She talked for ten or fifteen minutes, and admitted to "participating in" her husband's abuse of their daughter. When asked to give a taped statement, she asked to see an attorney.

C.H. testified at trial that she and her brother T.H. stayed at the Holden home frequently on weekends. They slept in the same bedroom, at times the children slept on the floor, and at other times all four slept in the same bed. She testified William Holden had sexual contact with her, including fellatio. She testified Holden would be fondling her husband while he was "feeling [C.H.] out."

T.H. testified Holden fondled him and made him get on top of her and have intercourse with her. He testified his sister C.H. was also in the room, along with William Holden, and that all four sometimes slept on the same bed. T.H. testified that he had difficulty remembering what had happened, and that he was trying to put it out of his mind.

In June of 1984, C.H. had made allegations of sexual abuse on the part of her father, Robert Holden, who was eventually convicted. The visits to the William Holden residence then stopped. C.H. testified she did not bring up the abuse by her uncle and aunt at the time because her family was having a hard enough time dealing with the revelation of parental abuse. She stated she reported the abuse after learning of the charge concerning the Holdens' daughter.

The trial court allowed the state to amend its complaint to allege incidents occurring prior to 1983 and 1984, the dates originally specified in the complaint, and to go back to August 1, 1981. The trial court later ruled that pre–1981 incidents could come in as part of the same course of conduct, but that a cautionary instruction on the use of other-crimes evidence would be given.

During closing argument, the prosecutor compared Holden and her husband to "little bugs and critters scurrying around because suddenly they've been exposed to the light and the light bothers them * * *." The prosecutor referred to the fact the visits of T.H. and C.H. to the home ceased after C.H. reported abuse by her father. He also referred to evidence that William Holden then turned to abusing his daughter. The defense made no objection to this argument.

The jury found Holden guilty of first degree criminal sexual conduct, two counts of third degree criminal sexual conduct, and one count of criminal neglect of a child. The trial court vacated one count of third degree criminal sexual conduct. Minn.Stat. § 609.04 (1986). The court vacated the criminal neglect conviction for insufficient evidence. The court sentenced Holden to a 43–month executed prison sentence for the first degree criminal sexual conduct conviction and to a consecutive 18–month term for third degree criminal sexual conduct, execution stayed with Holden placed on probation for 10 years. The second conviction is to be vacated on successful completion of the sexual offenders treatment program.

## ISSUES

1. Did the trial court err in admitting evidence of Holden's statements to police?

2. Did the court abuse its discretion in allowing the state to amend the complaint and to present evidence of sexual abuse prior to August 1, 1982?

3. Did the prosecutor commit prejudicial misconduct in closing argument?

4. Was the evidence sufficient to sustain the convictions?

## ANALYSIS

### 1. *Holden's statements to police*

■ It is undisputed Holden was not given a Miranda warning before her first interview with Helsene, or during the interview, until she had made inculpatory statements and was asked for a taped statement. Holden had not been told she was under arrest, but was in the police station, and had not been told she could leave.

A Miranda warning is required only when there is custodial interrogation by the police. "Custodial interrogation" was defined in *Miranda* as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).

Our supreme court has held that a suspect who comes to the police station voluntarily to speak to police is not in custody or restrained of his freedom of action simply by being at the station. *State v. Marhoun,* 323 N.W.2d 729, 731 (Minn.1982), *reh'g denied* (Oct. 5, 1982). In *Marhoun,* the officer called the defendant and asked him if he would talk with him at BCA offices:

> Defendant, knowing that he did not have to talk with the officer, agreed and met the officer at the offices a short time later.
>
> \*   \*   \*   \*   \*   \*
>
> Defendant was also told in the middle of the interrogation that he was free to leave, but he chose not to do so. Under the circumstances, we conclude that the questioning was noncustodial \* \* \*.

*Id.; see also California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (suspect agreed to accompany police to station, police told him he was not under arrest and allowed him to leave after brief interview); *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (parolee called officer who had left his card, agreed to meet at state patrol office, was there told he was not under arrest, and confessed within five minutes).

In order for a defendant's meeting with police to be custodial, there must be " 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler,* 463 U.S. at 1125, 103 S.Ct. at 3520 (quoting *Mathiason,* 429 U.S. at 495, 97 S.Ct. at 714). That degree of restraint was not present here. Officer Helsene left the interview on two occasions, leaving Holden alone with the social worker in the room, which was just inside an unguarded lobby and exit. Whether or not Holden would have felt free to walk out, restraints equivalent to formal arrest were not present.

It appears also that Holden came to the police station voluntarily. Although the police officers who actually went to her in-laws' house to ask her to come down for questioning did not testify, Officer Helsene's testimony that Holden came voluntarily was unimpeached.

### 2. *Pre–1983 incidents*

■ Holden claims the court erred in allowing the state to introduce evidence of sexual incidents prior to August 1, 1982, and to amend its complaint to charge such incidents.

Effective August 1, 1982, the legislature enacted a seven-year statute of limitations for criminal sexual conduct offenses involving a familial relationship. 1982 Minn. Laws, ch. 432, § 1, codified at Minn.Stat. § 628.26(c) (1982). Familial relationship included that of aunt or uncle. Minn.Stat. § 609.364, subd. 9(c) (1982) (repealed 1985). Holden contends that before August 1, 1982, criminal sexual conduct was subject to a three-year statute of limitations; therefore, no such incidents could be charged in the 1986 complaint.

We need not address this issue because the pre-August 1, 1982, incidents were properly admitted as a Spreigl evidence and were not necessary to prove the offenses charged in the complaint. The first degree criminal sexual conduct charge required proof that the acts occurred before C.H. was thirteen. Minn.Stat. § 609.342(a) (1982). C.H. testified the sexual activity with William Holden, in which Doris Holden participated, occurred before her thirteenth birthday, which was August 15, 1983.

The third degree charge required proof that sexual acts with T.H. occurred between his 13th and 16th birthdays, or between April 8, 1982 and April 8, 1985. Minn.Stat. § 609.344, subd. 1(b). T.H. was not specific on the dates of the activity he could remember, but did testify penetration occurred on more than one occasion. It is clear from his testimony the activity was not confined to the April–August 1982 period.

The pre-August 1982 incidents were admissible as Spreigl offenses showing a common scheme or plan. Minn.R.Evid. 404(b); *Ture v. State*, 353 N.W.2d 518, 521 (Minn.1984). No notice was required because the incidents were part of the same occurrence or episode which was charged, *State v. Cermak*, 365 N.W.2d 238, 240–41 (Minn.1985) (quoting *State v. Volstad*, 287 N.W.2d 660, 662 (Minn.1980)).

### 3. *Prosecutorial misconduct*

■ Holden contends the prosecutor's reference to her and her family as "little bugs and critters scurrying around" when a rock is lifted, was unduly prejudicial. She did not object at trial to this argument, and generally would be considered to have waived the issue. *State v. Parker*, 353 N.W.2d 122, 127 (Minn.1984). The failure to object also implies the comments were not prejudicial. *Id.* at 128. A reviewing court can reverse, however, if the comments are "unduly prejudicial." *Id.*

The prosecutor's comments were similar to those made in *State v. Mousel*, 373 N.W. 2d 359, 363 (Minn.Ct.App.1985), where the prosecutor compared the defendants (and others) to leeches "sucking at the life-blood" of an estate, and to an octopus "squirt[ing] out these inky black clouds to hide where it's going." This court held that even if error was committed, it was harmless error. *Id.* at 364.

The prosecutor's statement here was perhaps excessive, but it was a comment on the evidence, in that the allegedly abused children had ceased their visits at the home immediately after the father's arrest for sexual abuse. The prosecutor's statement did not directly comment on Holden's defense, or the veracity of the witnesses.

### 4. *Strength of the evidence*

■ Holden's claim that the evidence was insufficient to sustain the convictions is without merit. Both T.H. and C.H. testified positively to the acts of penetration which occurred. Although their statements differed in detail from their initial reports to police, these minor discrepancies went to the credibility of their testimony, which was for the jury to determine. *State v. Daniels*, 361 N.W.2d 819, 826 (Minn. 1985). T.H. and C.H. are relatively mature children, whose testimony at trial was largely unimpeached, who were witnesses to the abuse of each other and who corroborated each other's testimony. Their testimony was also corroborated by Holden's statements to police and by other evidence.

### DECISION

The trial court did not err in admitting evidence of appellant's statements to police. The court did not abuse its discretion in allowing the state to amend the complaint or to present evidence of pre-August 1982 incidents. The prosecutor did not commit prejudicial misconduct. The evidence was sufficient to support the convictions.

Affirmed.