STATE of Minnesota, Respondent,

v.

Carlos Orlando SMITH, Appellant.

No. C6–94–1793.

Supreme Court of Minnesota.

Jan. 5, 1996.

John M. Stuart, Minnesota State Public Defender, Leslie J. Rosenberg, Assistant State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Attorney General, Darrell C. Hill, Assistant Ramsey County Attorney, St. Paul, for respondent.

## OPINION

TOMLJANOVICH, Justice.

Carlos Orlando Smith appeals his convictions of first-degree murder, Minn.Stat. § 609.185 (1992), second-degree murder, Minn.Stat. § 609.19 (1992), and aggravated robbery, Minn.Stat. § 609.245 (1992), which arose out of the robbery and beating of Raymond Barnett and the shooting of Dural Woods. We affirm.

On October 5, 1993, at approximately 10 p.m., Smith, Shane Pierson, Antonio Hudspeth, and John Edmundson drove to St. Paul from Minneapolis. Smith was carrying a gun and admitted that he usually carried a gun to protect himself when selling drugs. Upon reaching St. Paul, they drove to the vicinity of Selby Avenue and Milton Street where they saw Marcus Jackson and Raymond Barnett walking on the sidewalk. Smith had met Jackson two nights before at the home of a friend, Kasandra Shipp, but had never met Barnett. Smith pulled over, exchanged a few words with Jackson, and then drove on. At the intersection of Selby and Milton, Smith, Pierson, and Hudspeth got out of the car and ran after Jackson and Barnett, who came to a stop in front of Barnett's house at 911 Dayton. Jackson entered the house and Barnett remained outside. Smith testified that he asked Barnett whether he had been with Jackson at Shipp's house. Smith testified that upon Barnett responding no, he began hitting Barnett and that Pierson and Hudspeth joined in. Further, Smith acknowledged that they knocked Barnett to the ground, kicked him several times, and when Barnett tried to escape, Smith grabbed Barnett's pants, tearing them and pulling him down. Smith denies that he robbed Barnett, and also denies that he used a gun or a stick when he beat him.

Barnett testified that after Jackson went into the house, he heard a gun cocked near his head. He turned around and found himself facing a gun. He heard someone tell him, "Hit the ground." The right side of his head was hit with the gun and he fell to the ground. While he was down, someone held his head and someone else went through his pockets. He then heard, "Shoot him." Barnett stated that his shoes and pager were taken from him and that Smith was the person who had taken his shoes.

After the incident involving Barnett, Smith and his companions returned to the intersection at Selby and Milton because Smith wanted to buy marijuana. Smith observed Michael Kirkwood, Dennis Presley and Dural Woods, standing on the corner of Selby and Milton. According to Smith, he approached Woods and asked if he knew where he could

get a sack of Indow (high quality marijuana). Woods replied, "I got a $40.00 sack." Smith then handed Woods $40.00 and Woods handed him the sack. Smith checked the sack and testified that "it didn't look like it and smell like it, and I told him I didn't want it, I wanted my money back." Woods refused and a struggle ensued in which both Woods and Smith drew guns. Smith testified that Woods fired first and that in self defense he shot back. Smith recalls shooting at Woods twice while Woods was standing and twice more after he had fallen.

Kirkwood testified that he was about to use a pay phone when he observed three men running towards him. Thinking they were going to rob him, Kirkwood called Dennis Presley over. At the same time, Dural Woods was walking towards Kirkwood and Presley. Kirkwood recalls someone saying, "Jack move" to Woods. Kirkwood took this to mean they were going to rob Woods. Kirkwood observed the three men throwing Woods' arms up, twisting them, and going through his pockets. Kirkwood saw Smith shoot Woods in the head and then shoot him five more times after his body had fallen to the ground. Kirkwood denied observing any drug transaction between Smith and Woods. Kirkwood did not see Woods draw a gun.

Peter Hajjar, who lives across the street from 911 Dayton, was an eyewitness to both the beating and the shooting. Upon hearing shouting, he went to his window and saw three men stop at 911 Dayton, talk briefly with Barnett, and then begin to beat him. They knocked him to the ground and punched and kicked him. After the beating, Hajjar saw the three men run towards the Milton and Selby intersection "yelling, kind of loud * * * shouting." When they reached the intersection, Hajjar saw one of the three men draw a gun and shoot at one of the individuals who had been standing at the intersection.

The police stopped Smith and his companions in Minneapolis, and recovered a pager and a sneaker from the rear floor of the car. They did not find a gun. Smith was arrested and charged with murder in the first degree, murder in the second degree, and aggravated robbery.

At trial, the state introduced evidence that on September 29, 1993, Smith participated in another similar robbery and shooting in Minneapolis. Additionally, the state offered the testimony of Tor White, who was Woods' cousin, and Keith Richardson. Both were cell mates of Smith at the Ramsey County Adult Detention Center. White and Richardson testified that Smith admitted to the shooting, but did not claim that it was in self-defense or that a drug deal had been involved.

According to a presentence investigation report, White would get a 24–month sentence reduction on a pending Sale of Cocaine charge in exchange for testifying in this case. Due to discovery violations, the court precluded the defense from using the presentence investigation information. The court did allow the defense to ask a generic question.

> Mr. Hanzel: * * * Am I allowed to ask him a question * * * regarding if he hoped for any type of beneficial treatment at his sentencing? * * *
>
> The Court: And so what if he says no?
>
> Mr. Hansel: I guess I would have to live with it.
>
> The Court: Okay.

When the defense asked if he expected sentencing considerations in exchange for his testimony, White answered no.

The jury convicted Smith of first-degree murder, second-degree murder and aggravated robbery. Smith was sentenced to a mandatory life sentence for the murder of Woods and a consecutive sentence of 96 months, a double upward durational departure, for the aggravated robbery of Barnett. On appeal Smith argues that his conviction should be overturned, or alternatively that he should be given a new trial, because the prosecutor engaged in misconduct that prejudiced his trial, and that the trial court abused its discretion by admitting *Spreigl* evidence and abused its discretion by sentencing him to a double upward departure for the aggravated robbery conviction and making it consecutive to the life sentence.

■ Smith alleges three instances of prosecutorial misconduct which denied him a fair trial: the use of false testimony, the nondisclosure of a plea bargain with a State witness, and inappropriate statements in closing arguments. We review the alleged misconduct in light of the whole record and will reverse if the misconduct appears to be inexcusable and so serious and prejudicial that a defendant's right to a fair trial is denied. *State v. Wahlberg,* 296 N.W.2d 408, 420 (Minn.1980).

■ A new trial may be granted for false testimony where:

   (a) the court is reasonably well satisfied that the testimony given by a material witness is false.

   (b) without it the jury *might* have reached a different conclusion.

   (c) the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial.

*State v. Caldwell,* 322 N.W.2d 574, 584–585 (Minn.1982).

■ Smith contends the prosecutor acted inappropriately in using White's testimony that he did not expect to receive special consideration for testifying when it was false pursuant to *Giglio v. United States,* 405 U.S. 150, 154–155, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972) (holding a prosecutor's nondisclosure of a plea bargain made by his office but not disclosed to him required a new trial where the witness' credibility was an important issue). There was no testimony regarding a plea bargain but the presentence investigation report indicated White would get a 24–month sentence reduction on a Sale of Cocaine charge in exchange for testifying.

■ We understand that a prosecutor may not always be aware of plea bargains made by other prosecutors, but this was a plea bargain made by another prosecutor in the same office. We conclude that, as in *Giglio,* the prosecutor had a duty to discover and disclose any plea bargain made with White by another prosecutor in the office. It appears, however, that Smith's attorney learned of the bargain. The trial court apparently believed that, having actual knowledge of the bargain, Smith's attorney should have disclosed the information to the prosecutor so that the prosecutor could have elicited the information on direct examination of White. We believe that even if the trial court was correct in this, the trial court should have allowed the defense full impeachment use of the evidence, rather than requiring the defense to accept White's answer. It does not follow, however, that Smith is entitled to a new trial on this ground. The proffered evidence would not have altered White's direct testimony as to Smith's statements at the detention center, but only would have impeached his credibility, which already had been impeached by evidence that he was Woods' cousin. Moreover, the jury still would have been able to rely on the far more damaging eyewitness testimony by the other witnesses. Under the circumstances, we have no hesitancy in concluding that the jury, which we must presume to be a reasonable jury, would not have reached a different result even if it had been told of White's plea bargain. *Cf., Morgan v. State,* 384 N.W.2d 458, 460 (Minn.1986)(defendant not entitled to new trial on basis of newly discovered evidence that state's witness perjured self in testifying she received no benefit from state; jury would not reach different result on retrial).

Second, Smith argues that the prosecutor engaged in misconduct by not disclosing that in exchange for his testimony, Kirkwood pled guilty to a felony charge in another unrelated offense. Richard Newberry, an Assistant Ramsey County Attorney, denies the existence of this deal.[1] He testified that he told Kirkwood he would let Kirkwood's sentencing judge know of his cooperation and testimony in this case. As we concluded with respect to the impeachment of White's testimony, we conclude that even if the evidence of the alleged deal with Kirkwood had been

---

1. Richard Newberry did not testify in this present case; rather, he testified in *State v. Hudspeth,*

elicited, the jury would not have reached a different result.

■ Third, Smith alleges the prosecutor engaged in prosecutorial misconduct when he made the following statements in closing arguments:

Mr. White is in prison. Do you know what happens to people who testify against other people in prison? * * * But for some reason each of them found a level of humanity in their hearts which allowed them, in some small way, to sacrifice their own personal well-being for what they considered to be a larger issue.

■ It is well established by this court that the prosecutor and the defense have considerable latitude in closing argument, for neither is required to make a colorless argument. *State v. Jensen,* 308 Minn. 377, 380, 242 N.W.2d 109, 111 (1976). In closing arguments, counsel has the right to present to the jury all legitimate arguments on the evidence, to analyze and explain the evidence, and to present all proper inferences to be drawn therefrom. *Wahlberg,* 296 N.W.2d at 419. Moreover, in *State v. Parker* we stated:

Although we disapprove of closing arguments personally endorsing the credibility of the state's witnesses and injecting personal opinion, we do not believe that the statements[2] made in the instant case reach the threshold of impropriety.

353 N.W.2d 122, 128 (Minn.1984).

■ Here, it appears the prosecutor was trying to establish the credibility of his witnesses. While this court frowns upon such closing statements, they are permissible. *See Parker,* 353 N.W.2d at 128; *State v. Googins,* 255 N.W.2d 805, 806 (Minn.1977). Additionally, the language at issue here is similar to the language used in *Parker* which this court found did not reach the threshold of impropriety. 353 N.W.2d at 128. Thus, we hold that the prosecutor did not engage in misconduct.

■ Next, we turn to Smith's argument that the trial court abused its discretion by admitting evidence that Smith had participated in an aggravated robbery in Minneapolis two weeks before the current offenses. The decision to admit other crime evidence rests in the sound discretion of the trial court and will not be reversed absent a clear abuse of discretion. *State v. DeWald,* 464 N.W.2d 500, 503 (Minn.1991). As in *Hudspeth,* we need not address in detail the general issue of the admission of other crime evidence pursuant to Rule 404(b) since we have done so in a number of recent decisions. *See State v. Bolte,* 530 N.W.2d 191 (Minn.1995); *State v. Wermerskirchen,* 497 N.W.2d 235 (Minn. 1993). Smith was present at the scene of the other crime. The only issue is whether he was an intentional participant or whether he fired in self defense. The evidence that Smith actively participated in a similar robbery two weeks earlier was relevant evidence to rebutting his self-defense claim. Thus, the trial court did not abuse its discretion.

■ Next, we turn to Smith's contention that the trial court abused its discretion when it departed from the presumptive 48–month sentence for aggravated robbery to a 96–month sentence and in making this sentence consecutive instead of concurrent to the sentence for murder. A trial court has discretion to depart from the presumptive sentence when there exists "substantial and compelling" circumstances. Minn. Sent. Guidelines II.D.; *State v. Garcia,* 302 N.W.2d 643, 647 (Minn.1981).

■ In determining whether to depart durationally, the trial court looks to see whether a defendant's conduct was significantly more or less serious than that typically involved in the commission of the crime in question. *State v. Back,* 341 N.W.2d 273, 276 (Minn.1983). Minnesota Sentencing Guideline II.D.2.b.(2) lists "particular cruelty" as a

2. The statements at issue were made by the prosecutor in his closing argument and are as follows:

But there is an even more persuasive reason, I think, they are telling the truth. * * * That is why I say to you that if you think that these witnesses are lying, you can only come to that conclusion if you come to the conclusion that this whole thing is a phony and stinks from top to bottom and stem to stern. * * * But I do tell you these witnesses couldn't have done it by themselves, make up a big lie and tell it. *State v. Parker,* 353 N.W.2d 122, 128 (Minn. 1984).

reason that the trial court can use for the departure. While holding a gun to the victim's head is not enough to justify a departure, it is a factor which may be considered in determining whether the offense was conducted in a particularly serious way. *State v. Winchell,* 363 N.W.2d 747, 751 (Minn.1985). Gratuitous infliction of pain will qualify as "particular cruelty." *State v. Schantzen,* 308 N.W.2d 484, 487 (Minn.1981). Further, a departure may also be justified by taunts, threats and degradation of the victim. *State v. Mortland,* 399 N.W.2d 92, 95 (Minn.1987).

. ▆ In this case, Smith admits to beating Barnett. Barnett testified that he was knocked unconscious by the first blow and that when he regained consciousness he was being punched and kicked. Hajjar testified that the blows were so loud that he was able to hear them through the windows of his house. Barnett also testified a gun was used and he heard someone say, "Shoot him!" Where a gun is used in a robbery, gratuitous infliction of pain qualifies as particular cruelty. *Schantzen,* 308 N.W.2d at 487 (Minn. 1981). Thus, the trial court did not err in departing from the Sentencing Guidelines.

▆ Consecutive sentences may be imposed for crimes against different persons, but the multiple sentences must not unfairly exaggerate the criminality of the defendant's conduct. *State v. Montalvo,* 324 N.W.2d 650, 652 (Minn.1982). Consecutive sentences will not be overruled by this court unless there has been a clear abuse of discretion by the trial court. *State v. Brom,* 463 N.W.2d 758, 765 (Minn.1990). Minnesota Sentencing Guideline II.F.2. provides that consecutive sentencing is not a departure "[w]hen the offender is convicted of multiple current felony convictions for crimes against different persons, and when the sentence for the most severe current conviction is executed according to the guidelines."

Finally, Smith argues that because he is of African–American heritage, the trial court should have questioned the propriety of the departure pursuant to *State v. Williams,* 525 N.W.2d 538 (Minn.1994). In *Williams,* we expressed concern over the growing disparity of sentencing between people of color and Caucasians and we stated our intention to

monitor the sentencing practices of the trial court for drug offenses. *Id.* at 549. The facts and offense in *Williams* are distinguishable from the facts of this case. Here, there is sufficient evidence to affirm the conviction of aggravated robbery of Barnett and the murder of Woods. Since consecutive sentencing is permitted by Minnesota Sentencing Guideline II.F.2., the trial court did not abuse its discretion.

Accordingly, the conviction is affirmed.