STATE of Minnesota, Respondent,

v.

Brian Keith PIPPITT, Appellant.

No. C4–01–775.

Supreme Court of Minnesota.

June 13, 2002.

Melissa Sheridan, Asst. State Public Defender, St. Paul, MN, for appellant.

Mike Hatch, Attorney General, Kelly O'Neill Moller, Asst. Attorney General, St. Paul, MN, Bradley C. Rhodes, Aitkin County Attorney, Aitkin, MN, for respondent.

## OPINION

LANCASTER, Justice.

A jury found appellant Brian Keith Pippitt guilty of first-degree murder in violation of Minn.Stat. § 609.185(1) (2000), and first-degree murder while committing burglary in violation of Minn.Stat. § 609.185(3) (1996), for his role in the death of Evelyn Malin. The district court entered convictions for both crimes and imposed two concurrent life sentences. Pippitt raises six issues in this direct appeal: first, whether the evidence was sufficient to support his convictions; second, whether he is entitled to a new trial because of errors in the jury instructions; third, whether the district court abused its discretion by refusing to admit a letter into evidence; fourth, whether newly-discovered evidence entitles him to a new trial; fifth, whether the state withheld exculpatory information from the grand jury and misled the grand jury to obtain an indictment; and sixth, whether one of his convictions and sentences must be vacated. We affirm in part and vacate in part.

Evelyn Malin owned and operated the Dollar Lake Store in Aitkin County from 1945 until her death in 1998. The Dollar Lake Store was a small convenience store that sold cigarettes, beer, soda, candy, and other items. Malin's residence was attached to the store and consisted of a kitchen, a bedroom, and a living room that she used for storage. A curtain separated the store from the kitchen. A trap door in the kitchen led to a basement she used for additional storage.

Malin was 84 years old when she died. She was deaf in one ear and wore a hearing aid in her other ear. She walked with the assistance of two canes and could not walk down stairs. Because of her physical frailty, Malin's daughter, Norma Horner, and Horner's friend, Jerry Horseman, helped Malin open and close the store every day. Horner and Horseman usually arrived at 8:30 a.m. and returned at 10:00 p.m.

On February 24, 1998, Horner stopped by the store at 8:30 a.m. to help Malin open the store. Horner and Horseman went to the store that evening between 7:00 p.m. and 7:30 p.m., and left between 8:00 p.m. and 8:15 p.m. At approximately 9:00 p.m., Horner called Malin and Malin stated that she was not feeling well and was going to go to bed early. Malin told Horner that she and Horseman did not have to return to the store that evening.

The next morning, Horner and Horseman arrived at the store at 8:30 a.m. Because the store's open sign was not illuminated and newspapers were still on the steps, they assumed that Malin had overslept. While walking to the back door, they noticed that a screen had been removed from a ground-floor window and that panes of glass had been broken or removed from a basement window. Horner knocked on the back door and yelled in an effort to wake Malin. When Malin did not respond, Horner told Horseman to re-

turn to Horner's cabin and call 911. Horner continued her efforts to wake Malin.

Officers from the Aitkin County Sheriff's Office arrived at the store a few minutes after 9:00 a.m. The front and back doors were locked. The frame around the screen that had been removed from the ground-floor window displayed freshly exposed wood. One of the officers kicked in the back door and the officers searched Malin's house and store. An officer found Malin's body in her bedroom, lying in a pile of blankets and clothes. A mattress had been thrown over her. Malin's ankle was cold and she did not have a pulse. The officers left the building and secured the scene.

That afternoon, a team from the Minnesota Bureau of Criminal Apprehension arrived to investigate Malin's death. The team observed pry marks on wood from the basement window and determined that the basement window was the point of entry. The team concluded that Malin had died at least 12 hours but probably less than 36 hours before 6:30 p.m. on February 25. Two days later, Malin's son walked through the store and noticed that beer, cigarettes, and money were missing.

The medical examiner who performed an autopsy on Malin testified that she displayed injuries associated with manual strangulation and blunt force trauma. Malin had been struck with sufficient force to cause internal injuries to her head. She also displayed defense-type injuries in her upper extremities. The examiner concluded that manual strangulation was the primary cause of Malin's death and that blunt force trauma could have been a contributing factor in her death.

Approximately one year after Malin's death, the investigation focused on a group of individuals, among them Raymond Misquadace (Raymond). During the second of four interviews, Raymond confessed and implicated Pippitt, Keith Misquadace (Keith), Neil King, and Donald Hill in Malin's death. Raymond reached a plea agreement under which the charge against him was reduced from murder to manslaughter, and he agreed to serve 58 months in prison and to testify if called by the state. Hill also confessed to Malin's murder and confirmed that the individuals identified by Raymond were involved in her death.

The state called Raymond to testify at Pippitt's trial. Raymond testified that Pippitt, Keith, and King picked up Raymond and Hill in a two-door car from a house in East Lake between 3:00 p.m. and 4:00 p.m. on February 24, 1998. They planned to go to a party in Cloquet. First, they went to Wanda Misquadace's (Wanda) house on the Sandy Lake Reservation. They arrived at Wanda's between 4:00 p.m. and 4:30 p.m., stayed there for approximately one or two hours, and then left for Cloquet. On the way, they stopped at the Village Pump in Tamarack where Pippitt bought beer. They continued to drive to Cloquet. When they arrived in Sawyer, they decided to turn around because they were running out of gas. As they passed the Village Pump, they discussed purchasing more beer, but did not stop. They passed several bars but did not consider stopping at them. They arrived at the Dollar Lake Store at approximately 9:00 p.m. or 10:00 p.m., but it was closed. The five men exited the car and stretched. After a brief discussion, Keith walked to the left side of the store, Hill walked to the right side of the store, and Pippitt walked to the store's front door. King and Raymond returned to the car. Raymond thought that Keith, Hill, and Pippitt were going to try to enter the store to obtain beer.

A few moments later, Raymond heard a "little thump or crash" and a dog barking.

At some point, he noticed the front door open and shadows moving inside the store. Pippitt was no longer standing at the front door. Raymond then saw Pippitt, Keith, and Hill return to the car. Keith and Hill were carrying cigarettes and beer. Pippitt was carrying a bag and a long object. Raymond testified that Keith's hand was bloody and that he wrapped it in his shirt.

Raymond testified that when the five men drove away from the store, Keith was "jittery" and "hyper" and said that he choked Malin while Pippitt hit her. Raymond testified that Pippitt told the group to be quiet about what had happened at the store. The group arrived at a house on the Sandy Lake Reservation approximately 30 to 45 minutes after leaving the store. According to Raymond, Keith continued to talk about what had happened at the store, stating that they had killed Malin.

The state also called Peter Arnoldi to testify. Arnoldi met Pippitt at the Minnesota Security Hospital in Saint Peter in May 1999. According to Arnoldi, he and Pippitt discussed their cases on a daily basis for the two-and-one-half weeks that they spent at the hospital together. According to Arnoldi, Pippitt claimed that a group went to the store in a van to get some cigarettes, and burglarized the store through a window. Arnoldi also claimed that Pippitt stated someone had called for Pippitt's assistance to hold Malin down, and that he did so while they choked or suffocated her by stuffing tissue in her mouth. According to Arnoldi, Pippitt claimed the group then stole some cigarettes and beer. Arnoldi and Pippitt also discussed an alibi that Pippitt planned to offer at his trial—that someone would place him at a casino.

At trial, Pippitt attacked the credibility of both Raymond and Arnoldi. Raymond's uncle testified that Raymond is "not very truthful about anything" and that Raymond would lie under oath to escape trouble. Arnoldi testified that he did not request any deals in exchange for his testimony. The investigating officer who took Arnoldi's statement testified, however, that Arnoldi requested a transfer out of the Saint Cloud prison in exchange for his statement. The investigating officer requested that Arnoldi be transferred, and Arnoldi was transferred from Saint Cloud to Faribault. Pippitt also attempted to impeach Arnoldi by introducing evidence of Arnoldi's prior convictions. From 1989 to 1999, Arnoldi had five convictions for theft, one conviction for theft by false representation, four convictions for check forgery, and three convictions for third-degree burglary.

In addition to attacking the credibility of Raymond and Arnoldi, Pippitt presented an alibi. Michael Misquadace (Michael), Pippitt's nephew, testified that he was with Pippitt on February 24, 1998. Michael and Pippitt went to a pawn shop where Pippitt pawned a cassette, radio, and CD player for $30. They then went to a casino where Michael had an interview at 1:00 p.m. Pippitt spent the afternoon playing blackjack. Michael had another interview at the casino at 5:00 p.m. After Michael's second interview, Michael and Pippitt picked up Michael's brother, Brandon, and visited one of Michael's cousins. Michael, Brandon, and Pippitt then visited Joanne Kruse, Michael's fiancé, arriving at her parents' house at approximately 6:30 p.m. Michael and Brandon went inside while Pippitt remained in a van and drank. After "a while," Michael, Brandon, and Pippitt left, purchased some malt liquor, and went to Michael's grandmother's house.

Kruse testified that Michael, Brandon, and Pippitt stopped by her house late on February 24, 1998. On cross-examination, she admitted that she had no independent

recollection of February 24, 1998, and did not know when they arrived. Kruse's sister, Shannon Webb, remembered "very vaguely" that Michael, Brandon, and Pippitt stopped by her parents' house in late February 1998. Webb testified they arrived after 10:00 p.m. Webb's fiancé, Wesley Misquadace, also testified that Michael, Brandon, and Pippitt stopped by Webb's parents' house in late February 1998.

The state called Allen Forschen, the casino's vice-president of security, to testify in rebuttal. Forschen testified that Pippitt had been a member of the Grand Advantage Player Club (GAPC) since 1995. The casino issues a card to each GAPC member that allows the casino to record members' play. Members who use the card when playing obtain benefits from the casino. Forschen did not find any record of Pippitt playing at the casino on February 24, 1998.

Pippitt testified in surrebuttal. He testified that he was gambling in the casino on February 24, 1998, and that he usually does not use his GAPC card when he plays blackjack. On cross-examination, Pippitt acknowledged that he gave three statements to investigating officers, but did not inform the officers of his alibi in any of the statements.

The jury found Pippitt guilty of first-degree murder and first-degree murder while committing burglary. The district court entered convictions for both crimes and imposed two concurrent life sentences. This case presents Pippitt's direct appeal from the judgments of conviction.

### I.

■ Pippitt claims the evidence is insufficient to support his first-degree murder convictions because it consists of only testimony given by an accomplice and a jailhouse informant. When considering a sufficiency of the evidence challenge, we review the evidence presented at trial to determine whether the jury could reasonably have found the defendant guilty of the crime charged. *State v. Vick,* 632 N.W.2d 676, 690 (Minn.2001); *State v. Pilcher,* 472 N.W.2d 327, 334–35 (Minn.1991). We take the evidence in the light most favorable to the state and assume that the jury believed the state's witnesses and disbelieved any contradictory evidence. *State v. Voorhees,* 596 N.W.2d 241, 252 (Minn.1999); *State v. Merrill,* 274 N.W.2d 99, 111 (Minn.1978). The assumption that the jury believed the state's witnesses is particularly appropriate when resolution of the case depends on conflicting testimony, as it is the function of the jury to evaluate the credibility of the witnesses. *State v. Pieschke,* 295 N.W.2d 580, 584 (Minn.1980); *see also State v. Miles,* 585 N.W.2d 368, 373 (Minn.1998).

To convict Pippitt of first-degree premeditated murder, the state had to prove beyond a reasonable doubt that he "cause[d] the death of a human being with premeditation and with intent." Minn. Stat. § 609.185(1). To convict Pippitt of first-degree murder while committing burglary, the state had to prove beyond a reasonable doubt that he "cause[d] the death of a human being with intent to effect the death of the person * * *, while committing or attempting to commit burglary." Minn.Stat. § 609.185(3).

■ Raymond's testimony, particularly as it relates to Keith's description of what Keith and Pippitt did to Malin, supports the jury's verdicts. Pippitt maintains that his convictions must be reversed because Raymond is an accomplice and the state failed to corroborate Raymond's testimony. "A conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of

the offense * * *." Minn.Stat. § 634.04 (2000). If a witness could have been indicted and convicted for the crime with which the accused is charged, the witness is an accomplice for purposes of section 634.04. *State v. Henderson,* 620 N.W.2d 688, 701 (Minn.2001); *State v. Jones,* 311 Minn. 472, 473, 249 N.W.2d 893, 893 (1977). The state agrees that Raymond is an accomplice for purposes of section 634.04, and we therefore assume that Raymond is an accomplice for purposes of this analysis.

 "Corroborative evidence supporting the testimony of an accomplice must be 'weighty enough to restore confidence in the accomplice's testimony, confirming its truth and pointing to the defendant's guilt in some substantial way.'" *State v. Hooper,* 620 N.W.2d 31, 39 (Minn.2000) (quoting *State v. Norris,* 428 N.W.2d 61, 66–67 (Minn.1988)). We view corroborative evidence in the light most favorable to the verdict and do not require it to establish a prima facie case of the defendant's guilt. *State v. Johnson,* 616 N.W.2d 720, 727 (Minn.2000); *State v. Adams,* 295 N.W.2d 527, 533 (Minn.1980). All inconsistencies in the evidence are resolved in favor of the state. *State v. Bergeron,* 452 N.W.2d 918, 924 (Minn.1990).

Pippitt contends that Arnoldi's testimony fails to corroborate the accomplice testimony because it is inconsistent with Raymond's testimony and the physical evidence. We recognize that there are inconsistencies between Arnoldi's testimony and the other evidence presented at trial. For example, Raymond testified that the group drove a two-door car to the Dollar Lake Store, whereas Arnoldi testified that Pippitt told him the group drove to the store in a van. In addition, Raymond testified he thought Pippitt, Keith, and Hill were going to enter the store to obtain beer, yet Arnoldi testified that Pippitt stated the group went to the store to

obtain cigarettes. Furthermore, Arnoldi testified that Pippitt told him someone stuffed tissue into Malin's mouth, yet there is no evidence in the record that tissue was found in her mouth.

The state argues that Arnoldi's testimony regarding Pippitt's statements about the offense corroborated Raymond's testimony. Arnoldi's testimony was consistent with Raymond's testimony on a number of points. Arnoldi testified, for instance, that Pippitt admitted that he held Malin down while Malin was suffocated or choked. Similarly, Raymond testified that Keith admitted to choking Malin while Pippitt beat her. Raymond testified that Keith and Hill returned to the car with beer and cigarettes, and Arnoldi testified that Pippitt admitted the group stole beer and cigarettes.

Physical evidence was also consistent with the testimony of Raymond and Arnoldi. Window panes were removed from a basement window, and Arnoldi testified that Pippitt told him they entered through a window. The autopsy on Malin's body revealed that manual strangulation was the primary cause of death, consistent with the testimony of both Raymond and Arnoldi. Malin displayed injuries associated with blunt force trauma and defense-type injuries. She had been hit with sufficient force to cause internal injuries to her head. Consistent with the testimony of Raymond and Arnoldi, beer and cigarettes were missing from the store.

Raymond's testimony is corroborated on the essential issue of how the murder occurred—that Pippitt participated in choking Malin. This corroboration is "weighty enough to restore confidence in the accomplice's testimony, confirming its truth and pointing to the defendant's guilt in some substantial way." *Norris,* 428 N.W.2d at 66–67. In contrast, the inconsistencies in the testimony of Raymond and Arnoldi—

the nature of the vehicle driven to the store and whether the group sought beer or cigarettes—are resolved in favor of the state. *See Bergeron,* 452 N.W.2d at 924. Accordingly, we conclude that Raymond's testimony was sufficiently corroborated by Arnoldi's testimony to support the verdict under section 634.04.

At oral argument before this court, Pippitt's counsel acknowledged that Arnoldi's testimony, if believed, corroborated Raymond's testimony. Pippitt nonetheless asks us to completely discount Arnoldi's testimony, arguing that Arnoldi is not credible. We reject the premise of Pippitt's argument, specifically, that as a matter of law Arnoldi's testimony was not worthy of belief by the jury. *See State v. Folkers,* 581 N.W.2d 321, 326 (Minn.1998) (rejecting defendant's argument that impeachment rendered witness's testimony unworthy of belief as a matter of law); *State v. Stevens,* 248 Minn. 309, 313, 80 N.W.2d 22, 26 (1956) (stating that even if jurors believe that a witness knowingly and willfully testified falsely to a material fact, they may still believe witness's testimony as to other facts).

■ We acknowledge that Arnoldi's credibility was seriously called into question through the introduction of evidence of his multiple prior convictions for theft, forgery, and third-degree burglary and through conflicting testimony about his motivation for giving a statement in this case. However, weighing the credibility of witnesses is a function exclusively for the jury. *Pieschke,* 295 N.W.2d at 584. In this case, the jury heard the impeachment evidence and must have believed Arnoldi's testimony despite that evidence. Arnoldi's testimony was the only evidence corroborating Raymond's account of Pippitt's participation in Malin's murder. Given the district court's instruction to the jury that they must find corroboration, the jury must have found sufficient corroboration in Arnoldi's testimony. Indeed, the district court instructed the jury that evidence to corroborate the testimony of an accomplice "must do more than merely show that a crime was committed or show the circumstances of the crime," and that evidence suffices to corroborate an accomplice's testimony if "it tends to show that the defendant committed a crime and that taken with the testimony of an accomplice you are convinced beyond a reasonable doubt that the defendant committed the crime." We assume that the jury followed the district court's instructions. *State v. Ferguson,* 581 N.W.2d 824, 833 (Minn.1998). Therefore, we may not reject Arnoldi's testimony as unworthy of belief.

Because it was for the jury to evaluate Arnoldi's testimony in light of the impeachment evidence, and because that testimony sufficiently corroborated Raymond's testimony, the evidence was sufficient to support Pippitt's convictions.

## II.

■ Pippitt claims that he is entitled to a new trial because the district court did not instruct the jury that it could not draw any inference from his failure to testify in his own defense. The state argues that the district court's instructions were proper, and even if the instructions were erroneous, Pippitt waived his right to appeal on this basis.

■ In Minnesota, the standard instruction regarding a defendant's right not to testify is:

The State must convince you by evidence beyond a reasonable doubt that the defendant is guilty of the crime charged. The defendant has no obligation to prove innocence. The defendant has the right not to testify. This right is guaranteed by the federal and

state constitutions. You should not draw any inference from the fact that the defendant has not testified in this case.

10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal,* CRIMJIG 3.17 (4th ed.1999). When requested by a criminal defendant who did not testify at trial, a state trial judge must give a no-adverse-inference instruction to the jury. *McCollum v. State,* 640 N.W.2d 610, 616 (Minn.2002) (citing *Carter v. Kentucky,* 450 U.S. 288, 305, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981)).

In this case, Pippitt did not request the district court to instruct the jury that it could not draw an adverse inference from his failure to testify in his own defense. Instead, Pippitt's counsel asked the district court simply to instruct the jury that Pippitt had the right not to testify. The district court asked Pippitt personally whether he wanted such an instruction: "Is it your desire that I give an instruction that advises the jury that you have the right not to testify?" Pippitt answered, "I do." The district court then stated: "All right. I will give that instruction and then in the manner that I indicated [in the proposed jury instructions]." The proposed jury instructions did not contain an instruction similar to the final sentence of CRIMJIG 3.17. Neither Pippitt nor the state objected to the proposed jury instructions.

Pippitt testified at trial in surrebuttal, claiming that he was gambling in the casino on February 24, 1998. Under these circumstances, instructing the jury on how to consider his failure to testify would have been thoroughly confusing to the jury. Pippitt failed to request such an instruction, but more importantly, he did testify in his own defense. Therefore, we conclude that the district court did not err by failing to instruct the jury that it could not

draw any inference from Pippitt's failure to testify in his own defense.

## III.

■ In his pro se supplemental brief, Pippitt argues that the district court abused its discretion by excluding evidence of a letter allegedly written by Raymond to Joseph Ranberg. When Pippitt questioned Raymond about the letter at trial, Raymond testified he never wrote a letter to Ranberg. Ranberg was not called as a witness. The district court refused to admit the letter because Pippitt failed to establish a foundation and had not disclosed the letter to the state in discovery.

■ We will not reverse a district court's evidentiary ruling absent an abuse of discretion. *State v. Lindsey,* 632 N.W.2d 652, 662 (Minn.2001); *State v. Glaze,* 452 N.W.2d 655, 660 (Minn.1990). "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Minn. R. Evid. 901(a). In this case, Raymond testified that he never wrote a letter to Ranberg and there is no other evidence regarding the letter. In short, there is no evidence that the letter is what Pippitt claims it to be. Thus, Pippitt failed to establish proper foundation for the letter, and the district court did not abuse its discretion by excluding it.

## IV.

■ In his pro se supplemental brief, Pippitt asserts that he is entitled to a new trial based on newly-discovered evidence. He claims Craig Licari introduced himself to Pippitt in prison as being a former patient with Pippitt and Arnoldi at the Minnesota Security Hospital. Pippitt claims that Licari recounted a conversation between Licari and Arnoldi in which Ar-

noldi stated that "[Pippitt] was bummed out about his charge and that he was innocent of his charge."

Pippitt's newly-discovered evidence claim is not properly before the court because he did not present it to the district court through either a motion for a new trial or a petition for postconviction relief. *See State v. Hodgson,* 512 N.W.2d 95, 99 (Minn.1994) (refusing to consider a defendant's newly-discovered evidence claim on direct appeal from judgment of conviction). Therefore, we decline to address the newly-discovered evidence claim.

## V.

 Also in his pro se supplemental brief, Pippitt contends that the state withheld exculpatory information from the grand jury and misled the grand jury to obtain an indictment. Pursuant to Minn. R.Crim. P. 17.06, subd. 2, "[a]ll objections to an indictment * * * shall be made by motion as provided by Rule 10.01." A motion, other than an objection to jurisdiction or a claim that the indictment fails to charge an offense, must be served no later than three days before the omnibus hearing, unless the court extends the deadline for good cause. Minn. R.Crim. P. 10.04, subd. 1, 17.06, subd. 3; *State v. Whittaker,* 568 N.W.2d 440, 448 (Minn.1997). "Failure to include in a motion all defenses, objections, issues, and requests then available constitutes a waiver thereof, unless the court for good cause shown grants relief from the waiver." *Whittaker,* 568 N.W.2d at 448. Pippitt did not raise his objections to the indictment by motion in accordance with the Rules of Criminal Procedure, nor has he attempted to demonstrate good cause to grant relief from his waiver. Accordingly, we need not consider his objections to the indictment.

## VI.

Pippitt argues, and the state agrees, that one of his convictions and sentences should be vacated. We have stated that, pursuant to Minn.Stat. § 609.04 (2000), "[a] defendant cannot legally be convicted of two counts of first-degree murder where both convictions were for the same offense on the basis of the same act involving the same victim." *State v. Ture,* 353 N.W.2d 502, 517 (Minn. 1984); *see Johnson,* 616 N.W.2d at 730. Pippitt cannot legally be convicted of both counts of first-degree murder. We therefore vacate the judgment of conviction and sentence for first-degree murder while committing burglary and affirm the conviction and sentence for first-degree premeditated murder.

Affirmed in part, vacated in part.