**STATE of Minnesota, Respondent,**

v.

**Jason Lee BOLSTAD, Appellant.**

**No. A03–832.**

Supreme Court of Minnesota.

Sept. 23, 2004.

Timothy R. Anderson, Frederic Bruno & Associates, Minneapolis, MN, for Appellant.

Mike Hatch, Minnesota Attorney General, Kelly O'Neill Moller, Assistant Attorney General, St. Paul, MN, Norman J. Loren, Kanabec County Attorney, Mora, MN, for Respondent.

## OPINION

ANDERSON, PAUL H., Justice.

On April 2, 2003, a Kanabec County jury found Jason Lee Bolstad guilty of first-degree murder for the April 2, 1996 death of his father, Gary Bolstad. The Kanabec County District Court then sentenced Bolstad to life in prison. Bolstad appeals his conviction, arguing the evidence presented at trial was insufficient to support his conviction, the court abused its discretion in denying his request to recall a witness, and the state committed misconduct by making several unduly prejudicial statements during the course of the trial. We affirm.

Sometime after 9:00 p.m. on April 2, 1996, Larry Elwood received a telephone call from Patricia Reissig, n/k/a Patricia Sinn. Sinn asked Elwood to check on Gary Bolstad, her fiancée, because he had failed to show up for a 5:30 dinner engagement. Elwood was a friend of Gary Bolstad's and both lived in the Devil's Lake area of Kanabec County. Sinn lived in Anoka County. At approximately 9:45 p.m., Elwood found Gary Bolstad's body lying at the base of the porch of Bolstad's home. Elwood went to a neighbor's house to summon help. Officers from the Kanabec County Sheriff's Department soon arrived and secured the area. The Bureau of Criminal Apprehension (BCA) was contacted and led the subsequent investigation.

Gary Bolstad had been shot a number of times. His wounds from these shots were not life-threatening, and a medical examiner determined he remained conscious after being shot. The examiner also determined that Bolstad was struck a minimum of 24 times in the head with a blunt object. The subsequent medical examination determined that the cause of Bolstad's death was blunt trauma to the head. When Bolstad's body was found, his wallet was missing from the back pocket of his pants and the lining of his right front pants pocket was pulled out. Bolstad reportedly often carried a large amount of cash in that pocket.

On April 3, 1996, investigators interviewed Gary Bolstad's youngest son, appellant Jason Bolstad, who was then 19 years old. Jason Bolstad told investigators that he had an apartment in Blaine, but stated that during the days before and the day of April 2, 1996, he had been staying with his girlfriend, Lisa LeTourneau, at her apartment in Hudson, Wisconsin. Lisa LeTourneau's sister, Angie LeTourneau, was also staying at the apartment to take care of Lisa LeTourneau's son. Bolstad stated he had gotten up at around 10:30 a.m. on the day of his father's murder, went to a local McDonald's to eat, and returned to LeTourneau's apartment around noon. Bolstad stated that, when he returned, he found his friend William "Billy" VonWald at the apartment. VonWald, a high school senior, was dating Angie LeTourneau and had

stopped by the apartment to visit her during his lunch period.

Jason Bolstad then told investigators that he spent the afternoon of April 2 sleeping and watching movies. He said that at 4:00 p.m., VonWald stopped by the apartment on his way to work at a Wendy's restaurant and they watched movies for about an hour. Bolstad stated that, after VonWald finished work later that evening, he and VonWald went to a nearby store to shop. On April 4, 1996, Angie LeTourneau told investigators that Bolstad was in the Hudson apartment throughout the day on April 2, and Von-Wald stated that he saw Bolstad at the apartment at noon that day and again after work.

Jason Bolstad also told investigators about a 1995 incident when he and his father were outside his father's Devil's Lake home. Someone apparently shot at his father from across the lake and the bullet hit a nearby tire. According to Jason Bolstad, his father told him not to tell anybody about the incident.

In an effort to ascertain the time of death, investigators interviewed the garbage service route driver who collected Gary Bolstad's garbage on April 2. The garbage had been collected that day at approximately 12:45 p.m. The driver picked up the garbage from a garbage can at the end of the driveway and said that he did not notice anything unusual. The garbage can had been returned to its usual place near the house. The investigators concluded that Gary Bolstad apparently had put the garbage can away some time following the pick-up.

On two occasions in early April, investigators interviewed Gary Bolstad's neighbor Kathryn Harrison, n/k/a Kathryn Buzzell. Buzzell had arrived home from work on April 2 at 6:10 p.m. She noticed a vehicle in Gary Bolstad's driveway when she drove past his home. Buzzell, who worked at an auto body shop, told investigators that she recognized customers more by their cars than by their names. She said she thought the vehicle she saw in the driveway was an "older body style" Ford Ranger pick-up. She said a fence surrounding most of Gary Bolstad's property obstructed her view of the vehicle and this resulted in her being able to see only the vehicle's tailgate and some of its rear fender. She identified the vehicle as a Ford Ranger based on its body style, the "lines around the tailgate," and "the chrome panel across the tailgate." Buzzell said she did not pay attention to the vehicle's color.

David Harrison, Buzzell's husband at the time of the murder, also told authorities that he saw a vehicle in Gary Bolstad's driveway. Harrison described the vehicle and said he was absolutely certain that it was a Ford Ranger. Harrison did not testify at Jason Bolstad's trial, but his identification of the vehicle as a Ford Ranger and the fact that Harrison had familiarity with vehicles from his work as an insurance adjuster was introduced through the testimony of the investigator who interviewed him in April 1996.

On April 10, 1996, investigators recovered Gary Bolstad's bank card and other items that had been in his wallet. Two boys found these items in Andover in Anoka County while they were riding their bicycles. The location where the items were found was approximately one block away from the home of Gary Bolstad's oldest son, Jeff Bolstad. Jeff Bolstad is Jason Bolstad's half-brother.

On April 14 and 15, 1996, investigators interviewed Adam Sundermeyer. Adam Sundermeyer's sister, Mandi Sundermeyer, had been dating Jason Bolstad until a few weeks before Gary Bolstad's death. Adam Sundermeyer told investigators of

two conversations he had with Jason Bolstad before Gary Bolstad's murder. The first conversation took place on a road in Stanchfield, Minnesota, in the Spring of 1995. Sundermeyer stated that during this conversation Jason Bolstad offered Sundermeyer $10,000 to kill his father because he was mad at him.

The second conversation took place as the two shared a case of beer at Jason Bolstad's Blaine apartment. This conversation was within a month before Gary Bolstad's murder. Adam Sundermeyer told investigators that in this conversation Bolstad offered Sundermeyer $5,000 to kill his father, but did not say why he wanted his father killed. During this conversation, Bolstad referred to his father as a "prick" and also said he was planning to sell his truck to come up with the $5,000. In this conversation, Sundermeyer and Bolstad discussed shooting Bolstad's father with a rifle from a location across Devil's Lake—a location suggested by Bolstad. They also discussed using a specific size and caliber of rifle and the need for a scope sight and tripod. Sundermeyer testified later that he did not believe Bolstad was serious in either conversation. Sundermeyer did mention the conversations to his mother, but she could not recall if he mentioned them before or after Gary Bolstad's murder. Sundermeyer's mother did not go to a law enforcement agency with the information.

Adam Sundermeyer's girlfriend was with him in Jason Bolstad's apartment at the time of the second conversation and overheard parts of the conversation. The girlfriend stated at trial that Jason Bolstad's request for Sundermeyer to kill Gary Bolstad came across to her as a joke and she said that during the conversation Sundermeyer "laughed it off" as a joke. The girlfriend also stated that Jason Bol-stad had said he did not like his father and would like to have him dead.

Mandi Sundermeyer testified at trial that on "a few occasions" Jason Bolstad stated that he wished his father were dead because then he would be rich and would not have to work anymore. She stated that she did not take Jason Bolstad seriously and thought he was joking when he made the statement. She also stated that she believed money was important to Jason Bolstad because he talked about it frequently.

Jeff Bolstad testified that, about a month before his father's murder, Jason Bolstad told him that he was mad because their father would not help him replace his current Chevy truck with a Dodge Dakota. During this conversation, Jason Bolstad stated he wished their father were dead. Jeff Bolstad's wife, Kristine Bolstad, was present when Jason Bolstad made the statement and testified that she thought he was "just a hostile kid being mad at his parent."

On April 16, 1996, Jeff Bolstad, Jason Bolstad, and Gary Bolstad's parents went to the Kanabec State Bank to redeem Gary Bolstad's certificates of deposit (CDs) and close his other bank accounts. Gary Bolstad had named his sons and parents as the payable-on-death beneficiaries of the CDs. Jeff and Jason Bolstad received $104,525.67 and $87,222.02 respectively from the CDs. Gary Bolstad's parents received $158,758.43 total from the CDs and the other bank accounts. Jason Bolstad and Gary Bolstad's parents also were the beneficiaries of Gary Bolstad's will, but there is no indication that Jason Bolstad knew either of the existence of the will or that he was named as a beneficiary.

On April 17, 1996, investigators asked Jason Bolstad if he had ever asked someone to kill his father. Bolstad initially replied "Nope," but eventually admitted

that he had had the conversations with Adam Sundermeyer. Bolstad also admitted that he had said that he wished his father were dead, but added that he never said he would actually kill him. During this interview, investigators asked Bolstad about the 1995 incident when someone had allegedly shot at his father from across the lake. When asked if "there was a comparison" between this incident and his discussion with Adam Sundermeyer, Bolstad acknowledged there was a comparison, but said that the two were not connected and he did not get the idea to shoot his father from across the lake from the incident.

The investigation into Gary Bolstad's murder stalled after about 18 months had elapsed and no arrest had been made.

In October 2001, approximately 5½ years after Gary Bolstad's murder, Jeff O'Malley contacted the police with new information about the murder.[1] The information from O'Malley led investigators to contact three persons who had been with Angie LeTourneau at a summer festival in August 1996. All three told investigators that Angie LeTourneau had commented at the festival that she had not told investigators the truth when she said Jason Bolstad was with her in her sister's apartment throughout the day on April 2, 1996.

Investigators then interviewed Angie LeTourneau on January 3, 2002. Investigators challenged her earlier story by informing her that several persons had told them of her August 1996 comment. The investigators added that she might be called before a grand jury, and that the consequence of giving false testimony to a grand jury was felony perjury. Angie Le-

Tourneau, however, maintained that she had told the truth in 1996. Angie LeTourneau's brother, with whom she and her daughter were staying at the time, was present during this interview. Afterward, the brother spoke with investigators separately. Later that same day, the brother and his wife apparently talked to LeTourneau and told her she could lose custody of her daughter if she did not tell the truth.

Four days later, on January 7, 2002, Angie LeTourneau contacted the investigators. In an interview later that day at her brother's home, LeTourneau told investigators that she had lied about Jason Bolstad being with her in the apartment on April 2, 1996. She stated that Bolstad had left early in the afternoon and came back after dark. LeTourneau stated that when Bolstad returned to the apartment, he told her not to turn on the lights, went into the bathroom for about 15 minutes, and then carried a garbage bag out of the apartment. Bolstad did not have the bag with him when he returned to the apartment 10 or 15 minutes later. LeTourneau later testified at Bolstad's trial that he had told her to say he had been with her if anyone asked where he was.

In early January 2002, investigators contacted VonWald as part of their effort to reexamine Jason Bolstad's possible involvement in the murder. After the state offered VonWald immunity—the terms of which were negotiated through VonWald's attorney—the attorney delivered to investigators a Colt .32 caliber semiautomatic pistol. Investigators then interviewed VonWald on January 12. VonWald told them that he had lent the pistol to Jason

1. O'Malley was Lisa LeTourneau's former boyfriend and father of her first child. Lisa LeTourneau and Jason Bolstad eventually married and had two children of their own and Bolstad legally adopted LeTourneau's first child—fathered by O'Malley. Around the time O'Malley contacted law enforcement, LeTourneau and Bolstad had separated and were in the process of dissolving their marriage—a process that involved an apparently acrimonious dispute regarding visitation and custody.

Bolstad after the latter asked for a handgun to use at a target range. VonWald said he took the pistol from his father's dresser and gave it to Bolstad on March 29, 1996. VonWald also told investigators that on the evening of April 2, 1996, Jason Bolstad called him at work and told him he was done with the pistol and that VonWald could pick it up that evening at Lisa LeTourneau's apartment. After work, VonWald went to the apartment, took the pistol and its empty ammunition clip from the kitchen counter, and put them in the trunk of his car. He then returned to the apartment where he watched movies with Angie LeTourneau until midnight.

After their interviews with VonWald and Angie LeTourneau, investigators recontacted Buzzell, the neighbor who had seen a vehicle in Gary Bolstad's driveway the day of his murder. The investigators asked her to drive past the same driveway and look at a vehicle parked there in order to determine if it was the same one she saw on April 2, 1996. This identification took place using the Dodge Dakota pick-up that Jason Bolstad had purchased on March 29, 1996. Buzzell later testified that the vehicle resembled the one she saw in 1996, but she could not state with certainty that it was the same vehicle.

The BCA tested the pistol turned over by VonWald and was able to determine that it was the same pistol used to fire the bullets recovered during the investigation of Gary Bolstad's murder. The BCA also discovered traces of blood under the pistol's grip, hammer, and slide mechanism. The DNA profile of the blood found under the pistol's hammer matched Gary Bolstad's DNA profile with a relative frequency of no more than once in the world's population. The DNA profile of the blood found under the grip matched Gary Bolstad's DNA profile with a relative frequency of one in 320,000. A DNA profile could not be obtained from the traces of blood from under the slide.

On January 18, 2002, Jason Bolstad was arrested and charged by complaint with second-degree murder. On March 13, 2003, a Kanabec County grand jury indicted Bolstad on four criminal counts for the death of his father—two counts each of first-degree and second-degree murder. Minn.Stat. §§ 609.185(3) (2002) (first-degree felony murder), 609.185(1) (2002) (first-degree premeditated murder), 609.19(1) (2002) (second-degree intentional murder), 609.19(2) (2002) (second-degree felony murder). Jason Bolstad's jury trial began March 18, 2003. He did not testify at his trial. He did call several witnesses to testify mainly to his general character for peacefulness. Jason Bolstad also called a physician who testified regarding a heart condition he had known as supraventricular tachycardia (SVT) which causes a person's heart to beat at times in an abnormal rhythm.

On April 2, 2003, the jury found Jason Bolstad guilty on all four counts. The district court sentenced him to life in prison for the second count: premeditated first-degree murder. Bolstad appeals his conviction, arguing that the evidence presented at trial was insufficient to support his conviction, the court abused its discretion in denying his request to recall a witness, and the state committed misconduct by making a number of unduly prejudicial statements during the course of the trial.

## I.

Our review of a claim of insufficient evidence is limited to determining whether the jury could have reasonably concluded that the defendant is guilty of the offense based on the evidence presented at trial. *State v. Quick,* 659 N.W.2d 701, 709 (Minn.2003). We view the evi-

dence in the light most favorable to the verdict and assume "that the jury disbelieved any testimony in conflict with the result reached." *Woodruff v. State*, 608 N.W.2d 881, 889 (Minn.2000). We will uphold the jury's verdict "if, giving due regard to the presumption of innocence and to the state's burden of proving the defendant's guilt beyond a reasonable doubt, the jury could reasonably have found the defendant guilty." *Quick*, 659 N.W.2d at 709–10.

■■■ A conviction based on circumstantial evidence warrants particular scrutiny. *State v. Scharmer*, 501 N.W.2d 620, 621 (Minn.1993). In such a case, the evidence "must do more than give rise to a suspicion of guilt; '[i]t must point unerringly to the accused's guilt.'" *Scharmer*, 501 N.W.2d at 622 (quoting *State v. Loss*, 295 Minn. 271, 281, 204 N.W.2d 404, 409 (1973)). Nevertheless, "circumstantial evidence in a criminal case is entitled to as much weight as any other type of evidence so long as the circumstances proved are consistent with the hypothesis that the accused is guilty and inconsistent with any rational or reasonable hypothesis except for that of guilt." *State v. Wallace*, 558 N.W.2d 469, 472 (Minn.1997). Thus, in the context of the evidence as a whole, the circumstances must form a complete chain leading "so directly to the guilt of the accused as to exclude, beyond a reasonable doubt, any reasonable inference other than that of guilt." *State v. Wahlberg*, 296 N.W.2d 408, 411 (Minn.1980). While this is a strict standard, it remains the province of the jury to determine the credibility and weight of the circumstantial evidence and we will continue to assume the jury believed the state's witnesses and disbelieved the defendant's witnesses. *Quick*, 659 N.W.2d at 710. We have recognized that the jury is normally in the best position to evaluate circumstantial evidence and its

verdict is entitled to due deference. *State v. Webb*, 440 N.W.2d 426, 430 (Minn.1989).

Bolstad advances two primary arguments in claiming the evidence was insufficient to support his conviction. First, he asserts that the 1996 statements of Angie LeTourneau and VonWald confirming Bolstad's alibi defense are more credible than their subsequent statements in 2002. Bolstad argues that we should not credit Angie LeTourneau's testimony because in January 2002 investigators caused her to change her story by telling her she could face perjury charges and possibly go to jail if she lied to a grand jury. It is uncontroverted that investigators did discuss with LeTourneau the consequences of giving false testimony, but we can discern no reason to conclude that such an accurate warning caused LeTourneau to testify falsely.

The role of Angie LeTourneau's brother and his wife in causing LeTourneau to change her story is less clear. Although LeTourneau testified that no investigator told her she could lose her daughter, she did testify that upon returning home from a store the day of the first 2002 interview, her brother and his wife "told me that *they* had called back and said that if I don't tell the truth *they* would put me on the stand and basically try me and give me a lie detector test." (Emphasis added.) LeTourneau acknowledged that when she talked to her brother and his wife, she was under the impression she could be prosecuted and her daughter could be taken away from her. All of the foregoing circumstances surrounding LeTourneau's changed story were developed at length in testimony before the jury.

Our review of the record also indicates that the jury was presented with the relevant details of the circumstances surrounding VonWald's 1996 statement and his 2002 statement and the immunity he re-

ceived in exchange for his cooperation and testimony at trial.

■ In essence, Bolstad asks us to conclude that the testimony of Angie LeTourneau and VonWald was so lacking in credibility that it does not support the jury's finding of guilt, or alternatively could support a hypothesis that VonWald committed the murder. However, the facts of this case do not warrant usurping the jury's role in assessing credibility. In *State v. Pippitt*, we were asked to discount the testimony of a witness in an appeal based on a claim of insufficient evidence. 645 N.W.2d 87 (Minn.2002). In *Pippitt*, the witness's credibility was seriously called into question by evidence of multiple prior convictions and through conflicting testimony about his motivation for giving a statement in that case. *Id.* at 94. We noted that "weighing the credibility of witnesses is a function exclusively for the jury," and refused to reject the witness's testimony as unworthy of belief. *Id.* In *State v. Asfeld*, we upheld a verdict against a sufficiency challenge when the defendant asserted that the circumstantial evidence pointed "as strongly" to a different person as it did to him. 662 N.W.2d 534, 546 (Minn.2003). In *Asfeld*, we explained that, when the defendant asserts that the circumstantial evidence pointed to another person as well as the defendant, it "is precisely the kind of situation in which we apply the presumption that the jury, in its role as evaluator of witness credibility, believed the state's witnesses and disbelieved the defense witnesses." *Id.*

In this case, we conclude there is no basis for departing from our presumption favoring a jury's resolution of witness credibility. We conclude the jury would necessarily have assessed the credibility of LeTourneau and VonWald and their changed stories in light of the relevant surrounding circumstances. On the record

before us, there is no basis in the changed stories to question the jury's verdict against Bolstad. *See State v. Reichenberger*, 289 Minn. 75, 79–80, 182 N.W.2d 692, 695 (1970) (noting that the jury had been apprised of a witness's prior inconsistent statements and that weighing credibility was a task for the jury and not for this court). Therefore, we conclude that the part of Bolstad's sufficiency argument that is based on the credibility of LeTourneau and VonWald lacks merit.

■ Bolstad's second sufficiency of the evidence argument is that VonWald "was the most likely person to have been involved in the murder of Gary Bolstad" or, in other words, the evidence supports a reasonable inference other than that Bolstad is guilty. There is little doubt that the pistol surrendered by VonWald is the most incriminating piece of physical evidence connected to the murder. The implication resulting from the pistol's recovery and the subsequent determination that it was used during Gary Bolstad's murder is that whoever is connected to the possession of the pistol on April 2, 1996 is inextricably connected to the murder. VonWald testified that he lent the pistol to Jason Bolstad on March 29 and Bolstad returned it to him on the night of April 2. Although Jason Bolstad initially had an alibi placing him in Hudson throughout April 2, Angie LeTourneau's changed story leaves a gap of time during the afternoon and early evening of April 2 when Bolstad cannot account for his whereabouts.

In contrast, school attendance records show that VonWald was in school on April 2 during all seven class periods from 7:40 a.m. to 2:40 p.m. Employment records show that VonWald was at work that evening from 5:18 p.m. until 8:00 p.m. Given this evidence, it would be implausible for VonWald to have committed the murder because it takes three hours to make a

round trip from Hudson to Devil's Lake. In addition, there is no clear evidence that VonWald knew where Bolstad's father lived or had a motive to commit the murder. In response to the evidence supporting VonWald's alibi, Bolstad emphasizes a school official's acknowledgment at trial that human error does occur in taking attendance. Bolstad also claims that Von-Wald could have had another employee enter his employee identification number for him at work.

■ We note that the state presented extensive testimony regarding Bolstad's possible motives for killing his father. While evidence of a motive is not necessary to proving first-degree murder, "a motive helps form inferences from the circumstantial evidence, and adds credibility to the state's case." *Webb*, 440 N.W.2d at 431. After reviewing the record and Bolstad's arguments, we conclude there is no basis for departing from our presumption favoring the jury's resolution of contested issues of fact. In sum, we hold that the evidence presented by the state was sufficient to convict Jason Bolstad of the premeditated first-degree murder of his father.[2]

## II.

■ Bolstad next contends that the district court abused its discretion in denying his request to recall Sinn as a witness on the second to last day of testimony. Bolstad argues for admission of Sinn's testimony under Minn. R. Evid. 804(b)(5). We review a district court's decision on the admission of evidence for abuse of discretion. *State v. Williams*, 586 N.W.2d 123,

126 (Minn.1998). Absent a clear abuse of discretion, a district court's evidentiary ruling will not be reversed. *Id.*

After the state elicited testimony from investigators concerning Bolstad's statements about the 1995 incident when someone apparently shot at his father from across Devil's Lake, Sinn approached defense counsel offering to testify that Gary Bolstad had told her about the same incident. Sinn had been one of the first trial witnesses and, despite the district court's sequestration order, had been present in the courtroom for the testimony of subsequent witnesses. Apparently, counsel for Bolstad and the state discussed the matter of Sinn remaining in the courtroom after her testimony and agreed she could remain, but could not be recalled by either the state or the defense.

On appeal, Bolstad claims it was necessary to call Sinn to bolster his credibility by corroborating his 1996 statement to investigators about the 1995 incident. At trial, Bolstad's counsel's stated reason for proffering Sinn's testimony was to "show that this [1995] incident did, in fact, occur and that Gary Bolstad did not report it as one would expect someone to do under the circumstances and his reasons for not doing so, according to Ms. Sinn." Trial counsel then explained that Sinn's testimony was "more probative than any other evidence I can present at this point that the incident did occur." We note that this argument appears to have conflated the first two elements of Minn. R. Evid. 804(b)(5) by limiting the "point for which it is offered" to the "material fact" for which the statement is evidence. *See United States v. Sposito*, 106 F.3d 1042, 1047 (1st

---

**2.** Bolstad also makes a number of auxiliary assertions, such as it was unfair for investigators to not obtain potentially "exonerating evidence" in 1996 by inspecting his vehicle, his shoes, and taking his fingerprints even though he offered to cooperate, and failing to

test a tire track from the crime scene. The substance of Bolstad's assertions was presented to the jury and, when viewed in light of the presumptions of our standard of review, we conclude there is no basis to question the jury's resolution of them.

Cir.1997) (holding the plain language of Fed.R.Evid. 804(b)(5)(B)—now Fed. R.Evid. 807—does "not require that the issue on which the statement is most probative be a material fact; it requires only that it be probative on the point 'for which it is offered.' ").

The district court found that the underlying statement of Gary Bolstad was hearsay and that it was being offered as evidence of a material fact. When reaching this result, the court did not indicate what material fact it found the testimony was being offered to prove; but, based on counsel's argument, it appears that the fact or point for which it was offered was to prove the 1995 incident actually occurred. The court, focusing on Minn. R. Evid. 804(b)(5)(B)'s "more probative" language, noted that the jury had already heard about the shooting incident through the properly admitted testimony of investigators about Jason Bolstad's 1996 statements in which he gave an eyewitness account of the incident.

The district court concluded that Jason Bolstad's eyewitness account was more probative of the fact of the incident than Sinn's proffered testimony that Gary Bolstad had told her about the same incident. The court also expressed agreement with the state's contention that Sinn's testimony had reliability and trustworthiness problems because Sinn had never before mentioned the incident to investigators and she had only come forward after hearing other witnesses talk about the incident. In addition, the court noted that it was concerned about Sinn being in the courtroom despite the court's sequestration order. We conclude that the reasons given by the court do support its decision. Therefore, we hold that the court did not abuse its discretion when it denied Bolstad's request to recall Sinn.

## III.

Bolstad next contends that questions by the state during voir dire and comments during the state's opening statement and during its closing argument "had the distinct possibility of inflaming the passions of the jury and unduly prejudicing" its deliberations. Bolstad failed to object to the allegedly prejudicial conduct or request curative instructions. As Bolstad acknowledges, he is therefore deemed to have waived his right to appeal on the basis of this alleged misconduct. *State v. Torres,* 632 N.W.2d 609, 617–18 (Minn. 2001). However, we may still grant relief if we conclude that the state's conduct was so prejudicial that a defendant's right to a fair trial was denied. *See State v. Smith,* 541 N.W.2d 584, 588 (Minn.1996). In evaluating claims of misconduct, we look to the full trial record. *Id.*

During voir dire, the state asked each of the twelve jurors and two alternates about the topic of offering money to have a parent killed. The following three excerpts are representative of how the state examined the jurors on this topic:

*Excerpt # 1:*

Q: * * * * Would you describe that as a situation where your mom was neglectful of you or busy working and didn't have time to do things apparently as a single mom?

A: She was very young, and maybe just a little—maybe too young to handle the responsibilities and ...

Q: Okay. And sounding like your grandmother stepped in and you had a pretty good relationship with her?

A: Yes.

Q: And if I understood your answers, it sound[s] like your relationship with your mom has improved and you

have a pretty decent relationship with her now?

A: Yes.

Q: Have you ever asked someone if they would kill your mother, and offer them money?

A: No.

Q: Have you ever been involved in a situation where you heard someone offering money to kill one of their parents.

A: No.

Q: What would you do if you had heard someone doing that?

A: Well, I don't know that I would even believe it.

Q: Okay. If the Police came around and asked about that later on, would you be willing to talk with them about that?

A: Yes.

*Excerpt # 2*

Q: Have you ever asked someone if they would kill one of your parents for you and perhaps even offered money to do that?

A: No.

Q: Have you ever been in a situation where you heard someone offering money to have someone, especially even someone like a parent, killed?

A: No.

*Excerpt 3*

Q: Have you ever been in a situation where someone offered money to have a parent killed?

A: No.

Q: Have you ever been in a situation where someone said that they wished that their parent was dead?

A: No.

In particular, the state asked seven jurors whether they *themselves* had offered money to have a parent killed, as illustrat-

ed in excerpts one and two. In three of these instances, the state's question immediately followed questions about the individual juror's own parents and the juror's relationship with them. The state also asked five other jurors if they had been in a situation where someone offered money to have a parent or someone killed, as illustrated in excerpt three. The state asked another juror whether he had been in a situation where he or someone else had offered money to have a parent killed. In addition, the state asked a juror if he had been "in a situation where you were offered some money to have one of your parents killed?"

Bolstad claims that the state's voir dire questions "clearly were an attempt to infuse in the jurors from the start the idea that if someone even talks about such a horrible thing as wanting a parent dead, they must be guilty as charged." The state responds that the questions were asked "to determine whether to exercise a peremptory challenge" and that the information jurors obtained from the questions was the same as what they eventually learned from the evidence. The state also argues that because the defense theory was that Bolstad's statements about offering to pay to have his father killed were not serious, the state asked the questions to see how the jury would react to witness statements.

We are troubled by the nature of the state's questions and the possibility that, in some circumstances, this type of blunt questioning could inflame the passions of jurors. Such questioning could be a less than subtle means of getting jurors to identify with the victim and to indirectly commit to how they will react to testimony. While we are concerned about the nature of the state's questioning, given the record as a whole we conclude that the questioning was not unduly prejudicial.

Nevertheless, we note that in a closer case similar questioning has the potential for tipping the balance on appeal.

■ The next alleged misconduct occurred when, during opening statements, the state graphically described its theory of how Bolstad murdered his father. Bolstad argues that the opening statement was especially improper because the state's case was primarily based on circumstantial evidence and no one had ever placed Bolstad at the scene of the murder. Bolstad claims that the state's description prejudiced the jury against him before the first witness testified.

■ It is established that the state is not required to make a colorless argument and has a right to present all legitimate arguments on the evidence and to present all proper inferences to be drawn from the evidence. *Williams*, 586 N.W.2d at 127. Here, the state's description of how Bolstad's father was murdered was consistent with the testimony of BCA crime scene investigators and the medical examiner. In addition, the district court also instructed jurors just before the opening statement that

> You should listen attentively to any statement that the [a]ttorneys may make. Those statements are made so that you can better understand the testimony. What the [a]ttorneys say to you, however, is not evidence. Evidence is what the witnesses say, and also any exhibits that may be submitted to you.

Based on our review of the record, we conclude the state's opening statement was not unduly prejudicial to Bolstad.

■ The third, and final, alleged instance of misconduct occurred during the state's closing argument. The state asserted that

> if we had to prove guilt beyond all possibility of a doubt, we simply could never

hold accountable those who deny their guilt in order to avoid being held responsible. Nor is it doubt created by the imagination or ingenuity of one of the lawyers in the case.

Bolstad asserts that this statement was aimed at "belittling the constitutional role of defense counsel" and attacked Bolstad's decision to invoke his right not to testify. The state responds that parties are given latitude in closing arguments, the state properly described the standard of proof, and the statement was a small part of an argument spanning 66 pages of trial transcript.

In the context of Bolstad's trial, we have difficulty discerning any significant support for his contention that the state's comments during closing argument were unduly prejudicial to him. It does not appear that the comments attacked Bolstad's decision to not testify. The reference to "imagination or ingenuity" appears to relate to the several instances when Bolstad's counsel questioned witnesses about Bolstad's SVT heart condition. One of these witnesses, who was the last witness the defense called, was a physician, and the sole topic of his testimony was SVT and whether a person with this condition might experience a momentarily debilitating episode. Apparently, Bolstad wished to imply that this condition would have made him physically unable to commit the murder. Based on our review of the record, we conclude that Bolstad's argument that the state's comments during closing argument unduly prejudiced him lacks merit.

Based on the foregoing conclusions, we hold that the state's conduct at trial did not deny Bolstad a fair trial.

Affirmed.